## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**TRINA JOHNSON, on her own behalf
and as next friend of TREUNAH
JOHNSON,**

          Plaintiffs,                  Civil Action No.:1:24cv370 TBM-BWR

**v.**                                 **JURY DEMAND**

**HARRISON COUNTY SCHOOL
DISTRICT,**

          Defendant.

## FIRST AMENDED COMPLAINT

Trina Johnson (Ms. Johnson), as mother and next friend of Treunah Johnson, her daughter, (collectively Plaintiffs and individually Ms. Johnson and Treunah[1] respectively), by and through her attorney of record, hereby files this, their Plaintiffs' First Amended Complaint & Petition for Attorney's Fees against Defendant Harrison County Public School District, and in support thereof would respectfully show unto the Court as follows:

### I.     INTRODUCTION

1.  This is a complaint for judicial review of a final decision and hearing order rendered by Hearing Officer pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*. Ms. Johnson, on her on own behalf and behalf of her daughter, Treunah, appeals the

---

[1] Trina Johnson is Treunah Johnson's mother and her conservator. Given that their names both share the same initials, this Complaint will refer to Trina Johnson as Ms. Johnson and Treunah Johnson as Treunah in order to adequately distinguish the two. No disrespect is intended.

decision of a Special Education Hearing Officer for the Office of Special Education of the Mississippi Department of Education as entered in Case No. D04282020-25. Plaintiffs seek an order requiring the Defendant to provide Treunah with compensatory education and to reimburse Ms. Johnson for all expenses that she has incurred as a result of Defendant's failure to provide Treunah a free appropriate public education under the IDEA, among other things. Plaintiffs further seeks to recover attorneys' fees and other relief as stated more specifically below.

2.   Defendant has also discriminated against Treunah on the basis of her disabilities in violation of the Section 504 of Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq*. (ADA), by denying her participation in public education, constructively excluding her from public education, failing to provide equal opportunity, and by failing to provide her with the necessary reasonable accommodations that would have enabled her to receive the education which every other public school student was entitled to receive.

## II.    JURISDICTION AND VENUE

3.   This action arises, in part, under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§1400 *et seq*. Jurisdiction is conferred upon this Court by the IDEA, 20 U.S.C. §§1415(i)(2)(A) and 1415(i)(3)(A), which provides district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

4.   This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

5.   Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the Southern District of Mississippi and all events and omissions giving rise to this Complaint occurred in this judicial district. Defendant is a government entity doing business in this judicial district within the meaning of 28 U.S.C. § 1391(c).

6. Administrative exhaustion of the underlying case (Mississippi Department of Education Case No. D04282020-25) occurred through a state due process hearing with a Final Order by Hearing Officer James T. McCafferty dated September 6, 2024 (Final Order attached as *Exhibit A*). This appeal is timely brought within ninety (90) days after the issuance of the Final Order in the administrative proceeding. 7 Miss. Code. R. 34-E-300.516; see also 34 C.F.R. § 300.516; 20 § U.S.C. 1415(i)(2)(B).

7. Plaintiffs seek, *inter alia*, reversal of the Hearing Officer's decision and *de novo* review.

**III.    PARTIES**

8. Trina Johnson, in her own capacity and as Next Friend of Treunah Johnson, her daughter, are the Plaintiffs.

9. Treunah Johnson is now legally an adult. However, because her disabilities are lifelong and profound – she has both autism and intellectual disability – Ms. Johnson is now legally her conservator.

10. At the times relevant to this Complaint, Treunah Johnson resided in and was entitled to be enrolled as a student in Defendant Harrison County School District. Treunah was also eligible for special education services under the IDEA and had an Individualized Education Program (IEP) for the entirety of the time she resided in Defendant's school district.

11. Defendant Harrison County School District (referred to as HCSD, the District, and/or Defendant) is the educational entity required to provide a public education to students residing in Harrison County, Mississippi. Defendant is a publicly-funded entity that receives state and federal funding to provide special education to children with disabilities, like Treunah Johnson, under the IDEA, Section 504, and Title II of the ADA. It receives federal funding under the IDEA on the condition that it provides a free appropriate public education (FAPE) to children with disabilities.

12. Defendant is a recipient of federal financial assistance within the meaning of Section 504, 29 U.S.C.§ 794(b)(2)(B) and is a "public entity" as defined by the ADA, 42 U.S.C.§ 12131(1). Accordingly, Defendant is responsible for upholding the rights of children and their parents under Section 504 and the ADA.

13. Defendant is also an employer operating in Harrison County, Mississippi who, acting under color of law, deprived Treunah Johnson of Constitutional rights as set forth herein below.

14. Defendant may be served with process upon its Superintendent, William Bentz, at 11072 Highway 49, Gulfport, MS 39503.

### IV.    FACTS

15. Defendant clearly and blatantly denied Treunah Johnson a free appropriate public education (FAPE) in violation of its obligations under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq* (IDEA) and discriminated against Treunah because of her disability in violation of the Section 504 and Title II of the ADA. Treunah, a young woman with profound disabilities, has now exited the public school system wholly unequipped to function in her community. The responsibility for this tragedy lies squarely on Defendant's shoulders.

16. This case is an anachronism because it involves the constructive ouster of a student during her final two years of IDEA eligibility. During the 2019-2020 and 2020-2021 school years, Defendant only provided Treunah Johnson a mere five and a half (5.5) hours **per week** of "education" and services, while every other student in the district received seven and a half (7.5) hours **per day**. Treunah's services were certainly not provided in the least restrictive environment (LRE), but rather at an unaccredited tutoring center totally unequipped to meaningful educate or serve Treunah. And despite its length, Treunah's Individualized Education Program (IEP) completely failed to contain the requisite components to provide her a FAPE.

17. The preamble to the IDEA sets forth Congress's overarching goals and findings for its passage:

> Disability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.
>
> (2) Before the date of enactment of the Education for All Handicapped Children Act of 1975, the educational needs of millions of children with disabilities were not being fully met because—
> (A) the children did not receive appropriate educational services;
> (B) [they] were excluded entirely from the public school system and from being educated with their peers;
> (C) their undiagnosed disabilities prevented [them] from having a successful educational experience; or
> (D) a lack of adequate resources within the public school system forced families to find services outside the public school system.

20 SCS § 1400.

18. Congress made these finding first in 1975 and then again in 1990 upon reauthorization when the name of the law changed from the Education for All Handicapped Children Act (EHA) to the IDEA:

> Before EHA, many children were denied access to education and opportunities to learn. In 1970, U.S. schools educated only one in five children with disabilities, and many states had laws excluding certain students, including children who were deaf, blind, emotionally disturbed, or had an intellectual disability.
>
> Since the passage of EHA in 1975, significant progress has been made toward meeting major national goals for developing and implementing effective programs and services for early intervention, special education, and related services. The U.S. has progressed from excluding nearly 1.8 million children with disabilities from public schools prior to EHA implementation to providing more than 8 million children with disabilities with special education and related services designed to meet their individual needs in the 2022-23 school year.

https://sites.ed.gov/idea/IDEA-History (visited on Feb. 23, 2025). Thus, inclusion and services meeting individualized needs of children with disabilities has become the national standard.

19. Here, however, Defendant appears stuck in a pre-1975 era. Defendant did exactly what is described in the IDEA's preamble. Except that unlike the pre-1975 era, Defendant did not suffer a lack of resources. It has received federal and state public tax dollars through the state of Mississippi's Department of Education, funding conditioned upon its provision of a free appropriate public education to students with disabilities, students like Treunah Johnson. And Defendant has the benefit of decades of research and data about the services and education that would have provided Treunah a FAPE.

20. But instead Defendant:

- Failed to provide Treunah with appropriate educational services and necessary accommodations;

- Excluded Treunah from the public school system and from being educated with her peers;

- Did not properly evaluate – and therefore diagnose – Treunah's disabilities, thereby preventing her from having a successful educational experience (or really much of any educational experience);

- Improperly forced Ms. Johnson to find services on her own outside of the public school system rather than provide Treunah with the services she so desperately needed and to which she was entitled.

21. The IDEA's preamble goes on to explain that: "[T]he implementation of this title has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." *Id*. Here again, Defendant has demonstrated that it has had **no** expectations for Treunah, it has not had any focus whatsoever on

applying replicable research on proven methods of teaching and learning for children with disabilities.

22. In short, Defendant robbed Treunah not only of an education, but of the means to learn very basic activities of daily living and independence.

23. Defendant's failure to provided Treunah an education was not limited to her final two years of IDEA eligibility. Even prior to the 2019-2020 school year, Defendant failed to ever offer or provide Treunah the accommodations and special education she needed as a student with both autism and intellectual disability.

24. To fully understand the gravity of Defendant's failures to Treunah, a short history is helpful:

- Treunah's neurologist and pediatrician diagnosed her with autism at the age of 5;

- She came to Defendant's school district at age 10 with an autism diagnosis when she was also nonverbal and clearly intellectually disabled;

- Over and over again, Defendant failed to provide her the very research-based interventions, services, and teaching methods proven effective to teach children with autism – particularly when implemented early and often;

- Defendant never offered not provided Treunah with Applied Behavior Analysis (ABA) services, even though ABA is widely recognized as best practice and effective for addressing autism and intellectual disability[2];

- Her mother, Ms. Johnson, has consistently and repeatedly sought help and tried the best she could to advocate for her daughter;

---

[2] See, e.g., https://www.kennedykrieger.org/patient-care/centers-and-programs/neurobehavioral-unit-nbu/applied-behavior-analysis/scientific-professional-and-government-organizations-position-on-the-aba-from-the-neurobehavioral-unit-nbu (compilation of articles about the effectiveness of ABA in addressing autism and intellectual disability).

- Defendant never collected data to properly assess Treunah's abilities and disabilities;

- Defendant never developed an appropriate plan to address Treunah's behaviors – behaviors that are known autistic behaviors, and behaviors that significantly impeded Treunah's ability to access her education, behaviors that persisted throughout her time in the district;

- By the time the facts relevant to the underlying due process hearing started, Treunah had already been denied a FAPE for years;

- Treunah remains mostly nonverbal to date; and

- Defendant simply threw its hands in the air and did almost nothing.

25. By the 2019-2020 school year, rather than provide Treunah a FAPE, Defendant constructively excluded Treunah from public school and limited her access to education to four hours, with another hour and half a week of related services (speech and occupational therapy). And that was four hours a week, at a tutoring center, not in public school and not with the ability to have even portions of her day – like lunch or art or music – with her nondisabled peers. But four hours a week of tutoring, away from public school. Even the speech and occupational therapy she was provided took place away from school, away from peers – both disabled and nondisabled. And it was limited and deficient. And certainly did not receive any other necessary related services.

26. As a result of her disabilities of autism and intellectual disability, Treunah needs **more** to make even a small amount of progress: more services, more interventions, more time, more repetition – than typically developing students. Instead, Defendant gave not only less, but next to nothing.

27. There is simply no question that Defendant denied Treunah a FAPE. And the tragedy is that Treunah is now a young adult who is unable to communicate with the outside world, a young

adult still in desperate need of services and of an education. Defendant has abdicated our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.

28.    On April 24, 2020, Ms. Johnson filed a Due Process Complaint (see attached *Exhibit B*) with the Office of Special Education of the Mississippi Department of Education (MDE) pursuant to the IDEA. The Due Process Complaint alleges that Defendant denied Treunah a FAPE starting in the 2019-2020 school year by failing to provide her even a *de minimus* education by providing her a mere four hours of instruction a week at a placement that was one of the most restrictive[3], all in deep conflict with the mandates of the IDEA. The Due Process Complaint similarly alleges that Defendant did not provide Treunah the opportunity to participate – to the extent possible – with the general education population, thereby denying Treunah the right to be educated in the least restrictive environment.[4] And the Due Process Complaint alleges that Defendant denied Treunah a FAPE by failing to develop a meaningful transition services plan.[5]

29.    The Due Process Complaint also alleges that Defendant denied Ms. Johnson her IDEA rights to parental participation.[6] Full and effective parental participation is an integral part of the IEP process. As the U.S. Supreme Court explained in *Schaffer v. Weast*, the IDEA requires school district to develop an IEP for each child with a disability with parents playing "a significant role" in this process. 546 U.S. 49, 53 (2005). Parents serve as members of the team that develops the IPE. 20 U.S.C. § 1414(d)(1)(B). Moreover, the "concerns" and input of parents "for enhancing the education of their child" must be considered by the team. 20 U.S.C. § 1414(d)(3)(A)(ii). The

---

[3] This is alleged through issues III, IV, VI, and VIII in the Due Process Complaint.
[4] This is alleged through issues I, III, IV, AND VIII in the Due Process Complaint.
[5] This is alleged through issue V in the Due Process Complaint.
[6] This is alleged through issues I, II, VII, and IX in the Due Process Complaint.

IDEA accords parents additional protections that apply throughout the IEP process. *See, e.g.,* 20 U.S.C. § 1414(d)(4)(A) (requiring the IEP Team to revise the IEP when appropriate to address certain information provided by the parents); 20 U.S.C. § 1414(e) (requiring States to "ensure that the parents of [a child with a disability] are members of any group that makes decisions on the educational placement of their child.").

30.    Defendant has both substantive and procedural obligations under the IDEA. To satisfy its procedural obligations, a school designates an IEP Team (comprised of teachers, school officials, and the child's parent(s)) tasked with preparing a "comprehensive plan . . . in compliance with a detailed set of procedures." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1,* 137 S. Ct. 988, 994 (2017); *see also* 20 U.S.C. § 1414(d)(1)(B). An actionable procedural violation of the IDEA exists where the school district's violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; *or* (3) caused a deprivation of educational benefits. *See* 20 U.S.C. § 1415(f)(3)(E)(ii) (emphasis added).

31.    To meet its substantive obligations, a school must provide an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.,* 137 S. Ct. at 997. Thus, a substantive violation of the IDEA exists where a FAPE is not provided.

32.    The Fifth Circuit uses a specific standard to determine whether a school district has provided a student with a FAPE that includes both procedural and substantive requirements. Procedurally, the court examines whether the school district has complied with the procedural requirements of the IDEA. This includes ensuring that parents have the opportunity to participate in the decision-making process regarding their child's education and that the school district has

followed the necessary steps in developing and implementing the IEP. *Cornelius v. Houston Indep. Sch. Dist.*, 333 F. Supp. 3d 674 (S.D.Tex. 2017), *Joe V. v. Wimberley Indep. Sch. Dis*t., 2021 U.S. Dist. LEXIS 150362 (W.D.Tex. 2021). In this case, Defendant failed to meet its procedural requirements by failing to develop a transition services plan, failing to conduct a sufficient functional behavior analysis (FBA), failing to develop a sufficient behavior intervention plan (BIP), failing to include Ms. Johnson as a parent in all decision making, and failing to include all required members on the IEP team.[7]

33.    Substantively, the Fifth Circuit employs a four-factor test, known as the *Michael F.* test, to evaluate whether the IEP is reasonably calculated to provide educational benefits. The four factors are: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by key stakeholders; and (4) whether positive academic and non-academic benefits are demonstrated. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247-48 (5th Cir. 1997); *see also R.S. v. Highland Park Indep. Sch. Dist.*, 951 F.3d 319 (5th Cir. 2020), *E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, (5th Cir. 2018).

---

[7] Although not specifically identified as an issue in the due process complaint, the failure to have a general education teacher at almost all of the IEP meetings in the 2019-2020 school year (see Ms. Flickinger's testimony) is a procedural violation of the IDEA. 20 U.S.C. § 1414(d)(1)(B)(ii). This information was not known to Complainant until testimony at the due process hearing from Ms. Flickinger confirmed this fact. While the IDEA specifies that a general education teacher is required "if the child is, or may be, participating in the regular education environment," Complainant contends that Defendant should have included Treunah in the general education environment for at least a part of her day. *Id.* Determining when and how that might occur is exactly why a general education teacher is required. While procedural, this leads to a substantive denial of FAPE because Treunah was therefore not educated in the least restrictive environment.

34.     The court also considers whether the IEP is "reasonably calculated to enable the child to receive educational benefits" and whether it is "appropriately ambitious in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386. The IEP does not need to maximize the child's potential but must provide more than *a de minimis* educational benefit *Michael F.*, 118 F.3d 245.

35.     As a starting point, Defendant barred Treunah's access to public education. Defendant did not provide Treunah with the same number of hours of instruction as non-disabled students. And that's putting it mildly. By providing her only four hours of instruction a week with an additional ninety minutes of related services (occupational and speech therapies), Defendant provided fewer hours of "education" to Treunah in one week than it provides every other student in one day. The way in which Defendant effectively denied Treunah access to school is not merely a denial of a FAPE; it's the denial of the education provided to every other student, every non-disabled student.

36.     This is not merely a facial denial of FAPE, as it would be for any student, but also particularly harmful given the nature of Treunah's disabilities. Treunah needs more repetition and more instruction in order to make progress as compared to a typical student. Instead, Defendant gave Treunah substantially less than her non-disabled peers received. This cannot be left unredressed.

37.     Defendant also constructively blocked Treunah from attending school by failing to timely conduct an FBA and never developing a meaningful BIP. At no point prior to late 2019 did Defendant conduct an FBA despite the fact that Treunah's behaviors started from the moment she entered the district in 2010. Dr. Roberts testified about the inadequacy of the FBA and BIP, and

none of the district's witnesses about the development of the FBA or the sufficiency of the BIP were credible.

38.    Defendant failed to provide Treunah a FAPE by failing to provide her the required number of hours, but also but failing to develop an appropriate IEP and by failing to provide her the necessary educational programming and content that meets both the *Endrew F.* and the Fifth Circuit FAPE standards.

39.    In particular, as a person with autism and intellectual disability, Treunah would have benefitted from ABA services. Put differently, had Treunah received ABA services, she would have been able to access her education (she would have been taught positive skills such as attending to tasks and would have learned to minimize negative behaviors, such as eloping).

40.    Evidence at hearing clearly demonstrated that no one employed by Defendant while Treunah was a student had the expertise or training needed to determine Treunah's strengths and deficits.

41.    Defendant also denied Treunah a FAPE by failing to provide occupational therapy that met all of her needs, not simply handwriting.

42.    Treunah also failed to make progress sufficient to demonstrate that Defendant provided a FAPE. Put differently, Defendant failed to provide a FAPE, and as a result Treunah failed to make sufficient progress.

43.    Defendant also failed to provide the Treunah with the mandated transition services. This is not a mere formality or box to check. The IDEA mandates that a FAPE prepares students with disabilities for further education, employment, and independent living. *See*, 20 U.S.C.S. § 1400(d)(1)(A); 34 C.F.R. § 300.1(a). See also, *H.W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454 (5th Cir. 2022), *C.G. v. Waller Indep. Sch. Dist.*, 697 Fed. Appx. 816 (5th Cir. 2015). Schools must

provide meaningful transition services to students with disabilities to prepare them for adult life, including post-secondary education, vocational education, integrated employment, and independent living. *Renee J. v. Houston Indep. Sch. Dist.*, 913 F.3d 523 (5th Cir. 2019), *Houston Indep. Sch. Dist. v. VP*, 582 F.3d 576 (5th Cir. 2009).

44.     According to 20 U.S.C.S. § 1414(d)(1)(A)(i)(VIII), transition services must include appropriate measurable postsecondary goals based on age-appropriate transition assessments and the services needed to assist the child in reaching those goals.[8] The failure to develop a transition plan (which effectively is the case here) constitutes a procedural violation of the IDEA. Congress determined the importance of providing transition services and the unique role and responsibility of school districts to identify and coordinate those services:

> Transition services are "aimed at preparing students (soon to leave school) for employment, *postsecondary education,* vocational training, continuing and adult education, adult services, *independent living,* or community participation." H.R. Rep. No. 544, 101st Cong., 2nd Sess., at 9-10 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1723, 1733 (emphasis added). Toward this end, Congress expects *schools* to develop "a coordinated set of activities for each student, based upon the" student's needs and taking into account the student's preferences and interests. *Id.* at 1732-33 (emphasis added). The *schools* are required to "(a) consider the post-school outcomes desired for that student, and (b) provide educational and related services designed to prepare the student for achieving these outcomes." *Id.* (emphasis added). Congress took special care in drafting the

---

[8] **(34) Transition** services. The term "**transition** services" means a coordinated set of activities for a child with a disability that—

**(A)** is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

**(B)** is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and

**(C)** includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C.S. § 1401(34).

> statutory definition of transition services to include a requirement that the coordinated set of activities for a student must "promote[] movement from school to post-school activities," because Congress "expects schools to familiarize themselves with the post-school opportunities and services available for students with disabilities in their communities and State, and make use of this information in the transition planning for individual students." *Id.* at 1733. Congress has squarely placed the "responsibility for developing and implementing interagency participation" on the administration of the school district, not upon the "already heavily-burdened teacher[,]" and Congress intends that other participating agencies will share responsibility with the schools for providing and funding a student's transition services. *Id.* at 1733-34.

*Yankton Sch. Dist. v. Schramm*, 900 F. Supp. 1182, 1192 (D.S.D. 1995). Congress determined that school districts – like HCSD – have the ability to identify community resources in creating transition services plans. Public schools accept federal funding under the condition that they prepare students with disabilities for their life after school, after their IDEA-eligible years. For students like Treunah, with several cognitive and communication disabilities, those transition services necessarily need to facilitate independent living and community involvement. Defendant simply did nothing. Here, Defendant substantively violated the IDEA by failing to provide any transition services at all, let alone services based on her individual needs. As a result, Treunah is totally unequipped for independent living and for post-school life.

45.    Defendant's violations did not end with the 2019-2020 school year, but continued through the end of Treunah's age and year of eligibility under the IDEA which was through the 2020-2021 school year.[9]

46. Ms. Johnson incurred out-of-pocket expenses as a result of Defendant's failures to provide Treunah a FAPE including, but not limited to, transportation costs to and from needed services, and missed work opportunities.

---

[9] In a highly unusual procedural posture, the due process hearing in this case did not occur until approximately four (4) years after the filing of the due process complaint.

47.  Finally, Plaintiffs not only appeal the Hearing Officer's Decision and Order in its entirety, but also appeal multiple procedural errors made by the Hearing Officer that materially prejudiced Plaintiffs, including but not limited to:

- The Hearing Officer *de facto* granted Defendant's improper and prejudicial Motion for a Continuance filed on the eve of the hearing when he failed to require the Defendant to put on its case during the allotted time for an in-person hearing. This gave Defendant an unfair litigation advantage by requiring Plaintiffs to put on their case during an in-person hearing but without the District witnesses they had subpoenaed (with the exception of one, Akeba Jackson-Harris), and allowing the District to put on its case weeks after hearing the bulk of Plaintiffs' case;

- The Hearing Officer made numerous erroneous evidentiary decisions, particularly when sustaining Defendant's objections to questions about the trial preparation of non-client witnesses and group preparation of both client and non-client witnesses (thus waiving attorney client privilege).

48. The Hearing Officer also failed to redress abusive and prejudicial behavior on the part of the Defendant and Defendant's counsel including but limited to:

- Failing to provide Treunah's full education record prior the due process hearing as required by the IDEA;

- Suppressing contact information for non-client witnesses;

- Failing to timely disclose discovery; and

- Failing to put on its case during the allotted hearing time.

49. This Court should not give any deference to the Hearing Officer's findings of fact as they are replete with errors. The Hearing Officer also made numerous errors of law. The errors of both fact and law include, but not limited to, the following:

- One glaring error of fact is the Hearing Officer's finding that, "When the 2020-2021 school year began the Student remained on homebound services." Exhibit A at 7. Treunah was not on homebound services at any point during the time period challenged by the April 24, 2020 due process complaint. This error is not simply a misunderstanding but materially impacts the legal consequence of being placed on homebound services as opposed to being placed in a private setting at public expense (i.e. the number of hours of education and services in those respective settings are materially different).

- The Hearing Officer used the wrong legal standard in determining whether Defendant provided a FAPE. The Hearing Officer cited *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 346 (5th Cir. 2000) for the proposition that "the law requires only that a district provide access to public education 'sufficient to confer some educational benefit upon the handicapped child.'" Exhibit A at 9-10, *citing Houston Indep. Sch. Dist.*, 200 F. 3d at 346. However, the Supreme Court found in a much more recent decision that, "When all is said and done, a student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly . . . awaiting the time when they were old enough to 'drop out.'" *Rowley*, 458 U. S., at 179, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (some internal quotation marks omitted). **The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances**." *Endrew F. v.*

*Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 402-03, 137 S. Ct. 988, 1001, 197 L.Ed.2d 335, 352 (2017) (emphasis added).

- The Hearing Officer simply accepted – in error – the testimony of District (Defendant) witnesses without independently analyzing and concluding that Defendant's actions complied with the mandates of the IDEA. The most egregious example is the Hearing Officer's statement (and conclusion) that, "Ms. Flickinger [a District witness] testified that the transition plan in [Treunah's] 2019-2020 IEP satisfied the Mississippi Department of Education's minimum requirements for a transition plan because it had an educational training goal, age-appropriate transition assessment, and at least one transition service for each transition goal." Exhibit A at 13. None of that was borne out by any other testimony nor by the document itself.

- The Hearing Officer also erred by failing to give sufficient weight to the testimony of non-District witnesses, particularly the testimony of Dr. Dannell Roberts who is a psychologist and Board Certified Behavior Analyst who conducted Treunah's Independent Education Evaluation.

- The Hearing Officer erred by finding that Treunah did not suffer "any lost educational opportunity because of any insufficiencies in the transition planning portion" of her IEP. Exhibit A at 13.

- The Hearing Officer erred by finding that the occupational therapy provided the Defendant was sufficient even though her IEP did not contain any occupational therapy goals and Defendant only addressed handwriting when Treunah's needs were much greater than simply handwriting. The Hearing Officer improperly disregarded the testimony of a private occupational therapist, Caitlyn Burgess, because "she agreed that she could not form an opinion as to whether the services provided by the District were

tailored to meet [Treunah's] needs." Exhibit A at 17. However, Ms. Burgess evaluated Treunah and testified that of the six motor skills she tested, only one was in normal limits. Treunah performed well below average, indicating severe delay or impairment in fine motor integration, manual control, upper limb coordination, and precision. Treunah also displayed sensory processing regulation difference in auditory, visual, vestibular, touch, and multisensory processing, as well processing related to endurance and tone, modulation related to her body position and movement and of movement affecting activity level, input affecting emotional responses, modulation of visual input affecting emotional responses and activity level, emotion and social responses, behavioral outcomes of her sensory processing, and her thresholds for response. Ms. Burgess also testified that safety awareness is a goal that occupational therapists can work on. Ms. Burgess also testified that occupational therapists, in conjunction with other providers, can also address eloping behaviors. The Hearing Officer took none of this into account. The Hearing Officer similarly failed to take into account any of the testimony of Dr. Roberts about Treunah's need for occupational therapy.

- The Hearing Officer erred in finding that the FBA and BIP were adequate. The Hearing Officer mischaracterized Dr. Roberts' testimony and gave undue weight to the testimony of Missy Yates (a District witness).

- The Hearing Officer erred in finding that the Defendant education Treunah in the least restrictive environment.

- The Hearing Officer erred in finding that "positive academic and non-academic benefits were realized." Exhibit A at 22. The evidence demonstrated that Treunah received almost no education for at least two years (2019-2020 and 2020-2021 school

years), that she is capable of learning and motivated to learn, but that she continues that lack even very basic social, academic, or communication skills.

## 21 CLAIMS

### a. IDEA Violations

50. All prior paragraphs are incorporated herein by reference.

51. Treunah was, at all times relevant, a student with disabilities as that term is defined by the IDEA. She was entitled to receive a FAPE under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*, (IDEA).

52. Ms. Johnson is the parent and now Treunah's conservator. Ms. Johnson brings this action in her own right and on behalf of her daughter Treunah.

53. Defendant failed to provide Treunah a FAPE during the 2019-2020 and 2020-2021 school years.

54. Defendant violated Ms. Johnson's rights as a parent during the 2019-2020 and 2020-2021 school years as described above.

55. Treunah is entitled to compensatory education as a result of Defendant's IDEA violations.

56. Ms. Johnson is entitled to reimbursement of all out-of-pocket expenses incurred as a result of Defendant's IDEA violations.

### b. Discrimination in Violation of Rehabilitation Act

57. Treunah is a qualified individual with a disability protected from discrimination based on disability by Section 504 of the Rehabilitation Act of 1973.

58. Defendant receives federal funds, and, therefore, is subject to the requirements of Section 504 of the Rehabilitation Act of 1973.

59. Treunah was entitled to equal opportunity to benefit from education and to reasonable accommodations for her disabilities.

60. Defendant refused to provide her with the accommodations and modifications necessary for her to access the curriculum. Defendant denied her equal opportunity by failing to provide appropriate special education services that were designed for all of Treunah's disabilities, namely ABA services.

61. Defendant did not train its teachers in providing accommodations and modifications needed to teach Treunah and to enable her to access her education.

62. Defendant also constructively excluded Treunah from accessing her education by failing to provide an adequate FBA and BIP.

63. Defendant also constructively excluded Treunah from accessing her education by failing to provide her with the requisite number of hours and in a public school setting.

64. Defendant acted intentionally and/or with deliberate indifference the above-described failures.

65. Defendant has intentionally and purposefully violated Treunah's rights secured by Section 504 of the Rehabilitation Act of 1973, *as amended,* 29 U.S.C. § 794 and 34 C.F.R. § 104.4, by:

      a.  Subjecting her to discrimination on the basis of their disability, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a).

      b.  Denying her, on the basis of her disabilities, the opportunity to participate in and benefit from federally-assisted regular education services, programs, and activities, including academic and nonacademic services and school activities, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a), (b)(I).

    c.   Failing to provide her an opportunity to participate in and benefit from education in the District and other services that is equal to the opportunity afforded students without disabilities, in violation of 34 C.F.R. § 104.4(b)(ii).

    d.   Failing to provide her with educational and other services that are as effective in providing equal opportunity as the services provided to students without disabilities, in the most integrated setting, in violation of 34 C.F.R. § 104.4(b)(1)(iii), (2).

    e.   Limiting her enjoyment of the right and opportunity to receive a public education in the District, in violation of 34 C.F.R. § 104.4(b)(1)(vii).

66.    Defendant failed to provide access and reasonably accommodate Treunah, and it failed to make reasonable modifications in the policies, practices, or procedures when the modifications were necessary to avoid discrimination.

67.    Defendant's refusal to provide reasonable accommodations to Treunah as a result of her disabilities denied her equal access and otherwise limiting his access to Defendant's facilities, programs, and services as compared his non-disabled peers and by subjecting her to discrimination solely because of her disability. *See* 34 C.F.R. §§ 104.4(a), 104.4(b)(ii) and (iv). The failure to accommodate is in violation of 29 U.S.C. § 794.

68.    As a proximate cause of these violations of Section 504, Treunah has suffered harm.

    **c.  Discrimination in Violation of Americans With Disabilities Act.**

69. All prior paragraphs are incorporated herein by reference.

70.    Treunah was, at all times relevant, a qualified individual with a disability protected from discrimination based on disability by the ADA.

71.    Defendant is a public entity and, is subject to the requirements of Title II of the ADA.

72.    Treunah was, at all times relevant, entitled to equal opportunity to benefit from education and to reasonable accommodations for her disabilities.

73. Defendant refused to provide her with the accommodations and modifications necessary for her to access the curriculum. Defendant denied her equal opportunity by failing to provide appropriate special education services that were designed for all of Treunah's disabilities, including but not limited to ABA services.

74. Defendant did not train its teachers in providing accommodations and modifications needed to teach Treunah and to enable her to access her education.

75. Defendant also constructively excluded Treunah from accessing her education by failing to provide an adequate FBA and BIP.

76. Defendant also constructively excluded Treunah from accessing her education by failing to provide her with the requisite number of hours and in a public school setting.

77.    Defendant has intentionally and purposefully violated Treunah's rights secured by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq*. and 28 C.F.R. § 35.130, by:

    a.    Subjecting her to discrimination on the basis of their disabilities in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(a).

    b.    Denying her, on the basis of her disabilities, the opportunity to participate in and benefit from the educational services, programs, and activities of the District, including academic and nonacademic services and school activities, in violation of 42 U.S.C. § 12132(a) and 28 C.F.R. § 30.130(a), (b)(1)(i).

    c.    Failing to provide her an opportunity to participate in and benefit from educational and other services that is equal to the opportunity afforded students without disabilities, in violation of 28 C.F.R. § 35.130(b)(ii).

     d.  Failing to provide her with educational and other services that are as effective in affording equal opportunity as the services provided to students without disabilities, in violation of 28 C.F.R. § 35.130(b)(iii).

     e.  Providing different and separate services to her from those provided to others, in violation of 28 C.F.R. 35.130(b)(iv).

     f.  Limiting her enjoyment of the right and opportunity to receive a public education in the District, in violation of 28 C.F.R. § 35.130(b)(1)(vii).

     g.  Failing to educate Treunah in the most integrated setting appropriate to her needs, in violation of 28 C.F.R. § 35.130(d).

78.    As a proximate cause of these violations of Title II of the Americans with Disabilities Act, Treunah has suffered harm as set forth above.

79.    Defendant's discriminatory conduct exhibited a willful and/or reckless indifference to Plaintiff's federally protected right to be free from disability.

## I.    CONCLUSION AND RELIEF

     **WHEREFORE**, Plaintiffs demand judgment against Defendant on each Count of the Complaint and pray for the following relief:

     A.  Receive the records of the administrative proceeding and hear additional evidence;

     B.  Reverse all portions of the hearing officer's decision and order;

     C.  Issue a declaration stating that Defendant violated Trina Johnson's rights under Individuals with Disabilities Education Act;

     D.  Issue a declaration stating that Defendant violated Treunah Johnson's rights under Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act;

E.  Permit Plaintiffs leave to amend this Complaint after reasonable discovery;

F.  Empanel a jury to try this matter;

G.  Award Treunah Johnson compensatory education;

H.  Award Trina Johnson reimbursement for any out-of-pocket expense for providing services (including, but not limited to, transportation) during the 2019-2020 and 2020-2021 school years that should have been provided by Defendant;

I.  Award Plaintiffs damages in an amount to be determined at trial;

J.  Award Plaintiffs their reasonable attorneys' fees, pursuant to the IDEA, the Rehabilitation Act, the Americans with Disabilities Act, 2 U.S.C. § 1988; and 42 U.S.C. § 12205;

K.  Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

L.  Award pre-and post-judgment interest in an appropriate amount; and

M. Grant Plaintiff such further relief as the Court may deem just and proper.

Respectfully submitted,

*s/ Kevin W. Frye*
**KEVIN W. FRYE, MSB # 101871**
1100 Tyler Avenue, Suite 101
Oxford, Mississippi 38655
Telephone: 662.259.0050
Facsimile: 866.710.3841
kwf@kevinwfrye.com

**Attorney for Plaintiffs**